# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 29, 2015 Session

## ROBIN G. JONES ET AL. v. BRADLEY COUNTY, TENNESSEE ET AL.

### Appeal from the Circuit Court for Bradley County
### No. V-13-271     Lawrence H. Puckett, Judge

---

### No. E2015-00204-COA-R3-CV-FILED-JANUARY 15, 2016

---

This is a governmental tort liability action against Bradley County Fire Rescue and Bradley County (collectively Bradley County) arising out of a motor vehicle accident at a large intersection in Cleveland, Tennessee. Fire Rescue employee Matthew Mundall, responding to an emergency call in a Ford F-250 truck equipped with siren and emergency lights, began making a left turn against the red light after stopping or slowing in an attempt to make sure the oncoming traffic lanes were clear. Plaintiff Robin G. Jones, who had the green light and testified she did not hear or see the emergency vehicle, drove into the intersection and collided with the truck. After a bench trial, the trial court allocated 40% fault to Jones and 60% fault to county employee Mundall. The court awarded Jones a judgment against Bradley County in the amount of $207,366.[1] Bradley County appeals, arguing that the court erred in its assessment of 60% fault against Mundall, and that the award of damages to Jones was excessive and unsupported by the evidence. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Thomas E. LeQuire and Michael A. Kent, Chattanooga, Tennessee, for appellants, Bradley County, Tennessee, and Bradley County Fire Rescue.

Flossie Weill, Chattanooga, Tennessee, for appellees, Robin G. Jones and Jack L. Lane.

---

[1] The trial court also awarded plaintiff Jack L. Lane, a passenger in Jones's car, a judgment of $23,894.51. That judgment has not been appealed.

1

Scott N. Davis and Stephan R. Wright, Chattanooga, Tennessee, for appellee, Robin G. Jones.

**OPINION**

**I.**

The accident occurred on July 18, 2012 at about 3:40 p.m. at the intersection of Inman and Keith Streets in Cleveland. Keith Street has two northbound and two southbound traffic lanes, in addition to a left turn lane and a right turn lane at the intersection. Inman Street similarly has two eastbound and two westbound lanes and two turn lanes at the traffic light. The roadways are generally straight and level around the intersection and the speed limit is 45 miles per hour for both streets. The weather was clear.

Mundall was driving west on Inman Street in response to a fire alarm. He testified that he activated the truck's emergency lights and siren, and that they were operating as he approached the intersection. Intending to make a left turn onto Keith Street, Mundall moved into the turn lane and checked traffic to see if it was safe to make the left turn against the red light. He did not see Jones's oncoming Chrysler 300M heading north on Keith Street.

Jones testified that she was traveling around 40 to 42 miles per hour as she approached the intersection. It is undisputed that she had the green light. She did not see or hear the emergency vehicle before the collision. Both Jones and passenger Lane testified that the car's windows were up, the air conditioner was on, and the radio was playing softly. Lane stated he did not hear a siren or see the emergency truck either, but that he was not really paying close attention. As the emergency truck pulled forward into the intersection in an attempt to turn left, Jones's car collided with its front left side, resulting in injuries to Jones and Lane.

Plaintiffs filed this action on April 4, 2013, alleging liability under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-202 (2012), for negligent operation of a motor vehicle by a county employee in the scope of his employment. Bradley County answered and filed a counterclaim against Jones for negligence. A bench trial took place over four days in late 2014. The trial court entered its final judgment on January 2, 2015. Bradley County timely filed a notice of appeal.

**II.**

Defendant Bradley County raises the following issues:

1. Did the trial court err in apportioning fault to emergency vehicle driver Mundall, who was making use of audible and visual emergency signals and entitled to the privileges granted by Tenn. Code Ann. § 55-8-108 (2012)?

2. Did the trial court err by not finding that the sole proximate cause of the accident was a breach of Plaintiff Jones's duty under Tenn. Code Ann. § 55-8-132 (2012) to yield the right of way under the circumstances?

3. Was the trial court's award of $150,000 to Jones for future medical expenses and $150,000 for past and future pain and suffering for her permanent injuries supported by the preponderance of the evidence?

4. Did the trial court err in refusing to award Bradley County a judgment on its counterclaim for property damage to its emergency vehicle?

### III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Cross v. City of Memphis*, 20 S.W.3d 642, 643 (Tenn. 2000). We review the trial court's findings of fact mindful of the well-established principles that "the trial court is in the best position to assess witness credibility and is owed great deference in this regard" and "a trial court has considerable latitude in allocating fault between or among culpable parties, and the appellate court reviews same with a presumption of correctness." *Huskey v. Rhea Cnty.*, No. 2012-02411-COA-R3-CV, 2013 WL 4807038, at *10 (Tenn. Ct. App. E.S., filed Sept 10, 2013) (quoting *Lindgren v. City of Johnson City*, 88 S.W.3d 581, 585 (Tenn. Ct. App. 2002); internal quotation marks omitted). There is no presumption of correctness as to the trial court's legal conclusions. *Mills v. Fulmarque*, 360 S.W.3d 362, 366 (Tenn. 2012); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

# IV.

## A.

Bradley County relies on Tenn. Code Ann. § 55-8-108, which provides privileges to emergency vehicle drivers under certain circumstances and states in pertinent part as follows:

> (a) The driver of an authorized emergency vehicle, when responding to an emergency call, or . . . when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions stated in this section.
>
> (b)(1) A driver of an authorized emergency vehicle operating the vehicle in accordance with subsection (a) may:
>
>     \*  \*  \*
>
> (B) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
>
>     \*  \*  \*
>
> and (D) Disregard regulations governing direction of movement or turning in specified directions.
>
> (2) Subdivision (b)(1) shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall subdivision (b)(1) protect the driver from the consequences of the driver's own reckless disregard for the safety of others.
>
> (c)(1) The exemptions granted under subsection (b) to a driver of an authorized emergency vehicle shall only apply when the vehicle is making use of audible and visual signals meeting the requirements of the applicable laws of this state[.]

4

Plaintiffs respond by arguing that although this statute allowed Mundall to turn left against the red light, he breached his duty "to drive with due regard for the safety of all persons," *id.*, under the circumstances and as found by the trial court. This court recently analyzed Tenn. Code Ann. § 55-8-108 in examining the duties of drivers in the context of an accident involving an ambulance, observing the following pertinent principles:

> Tennessee law provides that ambulance drivers are not required to strictly adhere to all traffic laws when responding to an emergency call, but must exercise these special privileges with "due regard for the safety of all persons." Tenn. Code Ann. § 55–8–108(b)(1)–(2).
>
> . . . [The emergency responders] were entitled to exceed speed limits and disregard regulations governing the direction of movement. However, as explained by the statute, this exemption is tempered by the fact that the ambulance driver may not place life or property in danger and must exercise due regard for all drivers. The obligation to exercise due care is, thus, not excused by the fact that the ambulance driver is responding to an emergency call. As explained in American Jurisprudence:
>
>> [T]he fact that an emergency vehicle on an emergency call is exempt from traffic regulations and is given the right of way over other travelers does not relieve the driver of such vehicle from the duty to drive with due regard for the safety of others using the highway. The drivers of emergency vehicles do not have the right to enter an intersection in blind reliance on their special right of way, but such drivers have to be alert and on the lookout for other travelers who might attempt to cross the intersection and who are lulled into a sense of security by the thought that they have the right of way.
>
> 8 Am.Jur.2d Automobiles § 812 (footnotes omitted). As further explained:

5

The fact that an ambulance is exempt from the operation of certain traffic regulations or enjoys certain prior rights over other vehicles does not permit the operators of such vehicles to drive in reckless disregard of the safety of others, nor does it relieve them of the general duty of exercising due care for the safety of others and their own safety.

Generally speaking, an ambulance driver is under a duty to exercise due care for the safety of all persons, and an ambulance driver must exercise reasonable precautions against extraordinary dangers of the situation which duty compels the driver to create. The fact that ambulances are exempted from the operation of certain traffic regulations or enjoy certain prior rights over other vehicles does not permit the operators of such vehicles to drive in reckless disregard of the safety of others, nor does it relieve them from the general duty of exercising due care for the safety of others and their own safety, or from the consequences of an arbitrary exercise of the right of way. Any careless, arbitrary, or unreasonable exercise of the driver's privileges is negligence. . . .

60A C.J.S. Motor Vehicles § 880 (footnotes omitted).

*Hardeman Cnty. v. McIntyre*, 420 S.W.3d 742, 748-49 (Tenn. Ct. App. 2013).

Bradley County further asserts that the trial court erred by declining to find that the sole proximate cause of the accident was Jones's breach of the duty imposed by Tenn. Code Ann. § 55-8-132, which provides that "[u]pon the immediate approach of an authorized emergency vehicle making use of audible and visual signals . . . [t]he driver of every other vehicle shall yield the right-of-way." In applying this statute, we have noted "the requirement of due care when entering an intersection even under authority of a green light" and observed that "[i]f plaintiff *should have heard* the siren or should have seen the blue lights flashing, she . . . cannot evade her duty to yield to an emergency vehicle by saying that she did not hear and did not see because she did not look." *Thomas v. State*, 742 S.W.2d 649, 653 (Tenn. Ct. App. 1987) (emphasis in original); *see*

6

*also* **Wright v. City of Knoxville**, 898 S.W.2d 177, 179-80 (Tenn. 1995); **Page v. Harrison**, 1990 WL 32107, at *4 (Tenn. Ct. App. W.S., filed Mar. 26, 1990); **Hall v. Town of Ashland City**, No. M2008-01504-COA-R3-CV, 2009 WL 363166, at *3 (Tenn. Ct. App. M.S., filed Feb. 12, 2009).

Plaintiffs argue that Mundall breached the standard of care by violating provisions of the Bradley County Fire Rescue operations manual, which provides in pertinent part:

> **2.09 WARNING DEVICES**:
>
> The use of warning lights and sirens does not automatically give the right-of-way to the emergency vehicle. These devices simply request the right-of-way from other drivers, based on their awareness of the emergency vehicle presence. Emergency vehicle drivers must make every possible effort to make their presence and intended actions known to other drivers, and must drive defensively to be prepared for the unexpected inappropriate actions of others.
>
> \* \* \*
>
> **2.12 INTERSECTIONS**:
>
> Intersections are the most dangerous areas to approach during an emergency response. The following special precautions shall be observed by all responding vehicles.
>
> \* \* \*
>
> B. When approaching a controlled intersection (stop sign or traffic light) with a negative right-of-way (red light or stop sign), the maximum permissible speed will be five (5) MPH and be prepared to stop and only proceed after the driver can account for all oncoming traffic in all lanes yielding the right-of-way.
>
> \* \* \*
>
> **2.15 DRIVER ATTENTION**:
>
> A. The driver shall focus full attention on the safe operation of the vehicle. The sole responsibility of the driver during an

emergency response is to drive.  The driver shall not operate the radio, lights, sirens, or any other equipment.  This shall be the responsibility of the Company Officer or the firefighter/technician acting in that capacity.

Drivers of Command vehicles . . . are exempt from this requirement if there is only one person in the front seat of the vehicle.  Drivers of these vehicles shall exercise extreme caution when it is necessary to operate equipment.

(Capitalization and bold font in original.)  The Cleveland-Bradley County Rescue Service operations manual, also introduced and relied upon by Plaintiffs, further provides:

Intersections are the most dangerous areas to approach during an emergency response.  The following special precautions should be observed at intersections:

a) Slow to a safe speed at which a stop could be made, and insure that all traffic has yielded.

b) Change the siren mode and use auxiliary warning devices if equipped.  Do not change the siren mode too frequently or while approaching vehicles which may not have time to move out of the way as this may frighten the driver who is trying to move out of the way.

c) Establish eye contact with the drivers of other vehicles.

The trial court saw and heard fifteen witnesses over the course of the four-day bench trial.  Plaintiff Jones testified that she was driving normally, paying attention to the road, and was not distracted by cell phone use or anything else.  She was heading north on Keith Street and said that she did not look at cross traffic at the intersection "because the traffic had already stopped on Inman Street" due to the red light.  As already stated, Jones testified that she did not hear a siren or see the emergency pickup truck until the collision occurred.  Plaintiff Lane generally corroborated Jones's testimony and did not see or hear the F-250 before the crash either.

Mundall was driving alone in the truck as he responded to the fire alarm call.  He approached the intersection traveling west on Inman Street and, as previously noted, moved into the left-hand turn lane to turn south on Keith Street.  He testified that he stopped at the painted stop bar in the turn lane and checked southbound traffic on Keith

Street. Jones was in the left travel lane of Keith Street. Martha Voyles was driving an Oldsmobile Intrigue in the right travel lane of Keith Street. Voyles saw the emergency vehicle approaching and stopped in time. Mundall testified that he could not see very far down Jones's lane of traffic because his view was blocked by Voyles' vehicle. He further stated as follows:

> Q: [W]hen you were stopped in the previous lane of traffic, you're stopped, *you can only see 10 or 15 feet down Mrs. Jones'[s] lane*, correct?
>
> A: Correct.
>
> Q: And instead of staying stopped until you could account for Mrs. Jones'[s] lane, you went on into Mrs. Jones'[s] lane, didn't you?
>
> A: I eased into her lane of traffic.
>
> Q: Even though you could not account one way or the other, there's a car or there's not a car, you didn't know?
>
> A  That was my intent to make sure that there was or was not a vehicle in that lane of traffic.
>
> Q: And you found out, didn't you?
>
> A: I think we both did.
>
> Q: And what it amounts to is you took a big chance when you entered Mrs. Jones'[s] lane with the front of that Ford F-250, you took a big chance, didn't you?
>
> A: It was a calculated risk.
>
> Q: It was a chance that you chose to take, wasn't it?
>
> A: Yes. That's part of my driver's responsibility is taking chances.

(Emphasis added.) Mundall reiterated several times that he could only see 10 or 15 feet into Jones'[s] traffic lane when he moved into that lane.

9

Voyles, like Jones, was traveling north on Keith Street. She testified that she saw the lights on the emergency vehicle and stopped in the right travel lane. Voyles had the windows down in her sedan and did not hear a siren. She said there was music playing "loud" on her car radio. She saw the emergency vehicle slow down, but testified that it did not stop before entering the intersection.

Austin Almazon, who was working the cash register at a nearby market and gas station, testified that he heard an emergency siren before hearing the noise from the collision. He did not see the collision. He stated that he heard only one type of siren, a constant "wail" noise, and that the sound did not change before the crash occurred.

Tennessee Highway Patrol officer Curtis Gregory Walker investigated the accident. He testified that Mundall told him that he had cleared the first two lanes of traffic heading northbound on Keith Street, and that the accident occurred in the third lane. Walker clarified on cross-examination that Mundall did not say whether he had "cleared," or made sure there was no oncoming traffic, in Jones's lane, before he entered it and the collision happened.

Troy Spence, director of the Bradley County Emergency Management Agency, testified that Mundall told him that he slowed down at the intersection in proceeding through the first two lanes of Keith Street traffic, but Mundall did not tell him that he had stopped the emergency vehicle before entering the intersection. Spence testified that it is "standard safe practice" for an emergency vehicle to stop first at the painted stop bar and make sure to account for every lane of traffic before entering an intersection against the red light.

Chattanooga Police Officer David Cowan provided expert testimony regarding the applicable standard of care. He opined that an emergency officer approaching a red light "is ultimately responsible for what happens in that intersection as he enters that intersection to go through it." Officer Cowan stated that the standard of due care required Mundall to stop and "make sure that he can properly can see and clear every single lane of travel that he is going against before he gets there." He testified that Mundall violated the standard of care under the circumstances by proceeding into Jones's lane without ascertaining that it was clear first. Cowan further opined that if a driver's vision "is obstructed by something else, then he should remain there" until the traffic light gives him the right-of-way.

The trial court also heard evidence about the level of visibility and audibility of the Ford F-250 as it approached the intersection. The emergency vehicle was referred to as a "slick top," meaning it had no light bar on top of the truck's cab. Mundall testified that

the truck was equipped with LED lights in the visor area facing frontward, on the front bumper, in the front grille, along the side steps and at the rear of the vehicle. He stated that the "side lighting for traffic coming at an intersection . . . was only as high as the step rail and as high as the rear wheel well." The side lights are 36 inches above the ground at the rear wheel well, and about 19 inches high at the side step bars. Officer Cowan testified that "you have to exercise more care with a slick top" because it "is less visible by nature and you can still add a plethora of side lighting to help make [up] for the lack of light bar on the top, but you do have to exercise more care and take into consideration that someone very well may not see you." The Plaintiffs did not introduce any evidence that the lighting on the F-250 was in violation of any rule or regulation, but argued that the relative lack of lighting was pertinent to the degree of care required of emergency driver Mundall, and to the comparative fault of Jones in failing to see the truck before impact.

Mundall testified that the truck's siren was capable of making several distinct sounds: a "wail which is just an oscillating siren tone going from a low to a high and back down to a low"; a "yelp which is essentially the same but it's at a faster rate"; and a "hyper-yelp" which is even faster and at a different tone. Contrary to the testimony of Jones, Lane, and eyewitness Voyles that none of them heard a siren before the accident, the trial court credited the testimony of Mundall that his siren was on, and of Almazon that he heard a siren before the crash. There was no evidence, however, that the "yelp" or the "hyper-yelp" sounds were activated, despite the Cleveland-Bradley County Rescue Operations guideline directing that the siren mode should be changed at intersections.

After hearing the above summarized testimony, the trial court issued an oral memorandum opinion, later incorporated into its final judgment. The trial court found that in this case, "her vehicle was there to be seen, his vehicle was there to be seen, they didn't see each other, but there is a duty to ascertain before you cross into that lane that you can do so safely, and safely means avoiding any collision in that lane." The court further stated,

> The other problem I have with the operation of the emergency vehicle is the sequencing of events as he enters this intersection I think was not an ordinary reasonable prudent method. . . . I think his processing left him subject to getting ahead of himself, getting through the intersection before it was really clear, and not ascertaining that it was clear before he began.

\* \* \*

11

So that's where I think there is some fault on the part of the driver of the County's vehicle. He clearly proceeded into the far lane of northbound traffic on Keith Street which is where Plaintiff's vehicle was coming without ascertaining that he could make that movement without – with safety. And he has . . . an ongoing duty of safety throughout the entire intersection.

\*     \*     \*

I believe the preponderance of the evidence is that the siren was operated and the lights were flashing for whatever benefit that was to people on the roadway when it is daylight and flashing lights, and the[re] are not very many of them on this vehicle[.] . . . Now, I don't think the yelps were operating, so that would indicate to me there wasn't a stopping once it was in the intersection at least. It wasn't one of these yelp, yelp, yelp, yelp, and I'm slowing and going through the intersection. I don't think that happened.

\*     \*     \*

[T]here's still a burden on the Plaintiff to keep a safe lookout ahead and to the sides of her vehicle and see what is there to be seen, but she didn't see it and neither did he see her.

\*     \*     \*

I am going to place 60 percent of the fault on the County driver and 40 percent of fault upon the Plaintiff driver in this case because I believe the procuring cause of this accident was the movement of the emergency vehicle as he testified himself that he did not really clear and ascertain whether that lane was clear before he moved into it, and that is what caused the accident.

As noted, Bradley County argues that the trial court erred in failing to find that the sole proximate cause of the accident was Jones's failure to yield the right-of-way, and in apportioning 60% of fault to Mundall. We disagree. The evidence does not preponderate against the trial court's finding that Mundall was 60% at fault for the accident. Mundall recognized and admitted his duty to use "extreme caution" under the circumstances,

12

particularly since he did not have a passenger to assist in working the emergency warning equipment. There was evidence from which the trial court could reasonably conclude that Mundall did not stop before entering the intersection. There was no evidence that he changed the siren mode to a "yelp" or "hyper-yelp" before entering the intersection, which would have made his approach more audible. Further, Mundall admitted that when he entered Jones's lane of oncoming traffic, he could see no more than 10 or 15 feet. Herman Hill, a traffic engineer and accident reconstructionist presented by the defense as an expert in traffic control and sight distance, stated that Jones was traveling about 40 miles per hour, which is roughly 58 feet per second. Thus, Mundall's own testimony confirms that when he moved into Jones's lane, he could only see as far as the distance that a vehicle moving at a lawful speed could travel in about one-quarter of a second. Finally, many of the trial court's findings of fact were dependent in large part upon its credibility assessments. We affirm the trial court's allocation of comparative fault.

**B.**

Bradley County argues that the trial court's award to Jones of $150,000 for pain and suffering and permanency of injuries was excessive and unsupported by the preponderance of the evidence. It makes the same argument with regard to Jones's award of $150,000 for future medical expenses. As the Supreme Court has recently observed,

> An award of damages, which is intended to make a plaintiff whole, compensates the plaintiff for damage or injury caused by a defendant's wrongful conduct. ***Inland Container Corp. v. March***, 529 S.W.2d 43, 44 (Tenn. 1975). A plaintiff may be compensated for any economic or pecuniary losses that naturally result from the defendant's wrongful conduct. ***Id.*** Economic damages include out-of-pocket medical expenses, future medical expenses, lost wages, and lost earning potential. The plaintiff bears the burden of proving damages to such a degree that, while perhaps not mathematically precise, will allow the [trier of fact] to make a reasoned assessment of the plaintiff's injury and loss. ***Provident Life & Accident Ins. Co. v. Globe Indem. Co.***, 156 Tenn. 571, 576–77, 3 S.W.2d 1057, 1058 (1928); ***Overstreet*** [***v. Shoney's Inc.***], 4 S.W.3d [694,] at 703 [(Tenn. Ct. App. 1999)].
>
> A plaintiff is also entitled to recover compensatory damages for non-economic loss or injury. ***Elliott v. Cobb***, 320 S.W.3d

13

246, 247 (Tenn. 2010). "Non-economic damages include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life." *Id.* at 248 n.1 (quoting *Overstreet*, 4 S.W.3d at 715). Damages for pain and suffering are awarded for the physical and mental suffering that accompany an injury. *Overstreet*, 4 S.W.3d at 715. Damages awarded for loss of enjoyment of life are intended to compensate a plaintiff for the impairment of the ability to enjoy the normal pleasures of living. *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 571–72 (Tenn. 2005). . . . The assessment of non-economic damages is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred. *See McCullough v. Johnson Freight Lines, Inc.*, 202 Tenn. 596, 606, 308 S.W.2d 387, 392 (1957); *S. Ry. Co. v. Sloan*, 56 Tenn.App. 380, 392, 407 S.W.2d 205, 211 (1965). Thus, a plaintiff is generally not required to prove the monetary value of non-economic damages.

*Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 419-20 (Tenn. 2013) (footnotes omitted).

In this case, Jones suffered injuries to her spine including compression fractures in two of her thoracic vertebrae and herniations of two cervical discs; injuries to her chest wall; and a fractured clavicle that resulted in a massive calcium deposit in her shoulder area. She incurred pretrial medical expenses in the amount of $45,610 resulting from the accident. Jones, who had pre-existing injuries and disabilities before the accident, testified regarding her pain levels and ability to function both before and after the accident. Additionally, two physicians testified in-person at trial, including her treating physician, Dr. Neal Frauwirth. Dr. Frauwirth treated Jones both before and after the accident and had been seeing her for about four years. He stated that the accident caused her intensified pain, permanent dysfunction, and "much more difficulty with daily life now." Dr. Frauwirth testified that "[t]hese are all permanent and they will continue to get worse. Her pain will become worse over time. These are actually structural problems." He concluded that Jones will likely need surgery and increasing amounts of pain medication in the future "and it's a very poor prognosis."

The trial court specifically credited the testimony and opinions of Plaintiff's witnesses Dr. Frauwirth and Dr. Avinash Sud, noting that "in this case it's one of the few I have ever seen, maybe the only one I have seen, where a treating doctor such as Frauwirth was doing pain management and was able to actually say what is new and what

is old in the patient." Although Bradley County argues that the possibility of future expenses for surgical treatment is speculative, Dr. Frauwirth stated that it was "*inevitable*" that Jones would need two surgical procedures: anterior discectomy and fusion of the neck, and kyphoplasty of the thoracic spine. He estimated the cost of the two surgeries to be $120,000 in total. Our review of the record persuades us that the evidence does not preponderate against the trial court's award of damages in this case.

In light of our decision affirming the trial court's allocation of 60% fault to Bradley County employee Mundall, we also affirm the court's refusal to award Bradley County a judgment on its counterclaim for property damage to its emergency vehicle.

## V.

The trial court's judgment is affirmed. Costs on appeal are assessed to the appellants, Bradley County, Tennessee, and Bradley County Fire Rescue. The case is remanded to the trial court, pursuant to applicable law, for enforcement of the judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

15